# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
### GREAT FALLS DIVISION

| | |
|---|---|
| **IN THE MATTER OF THE SEARCH OF:** | Case No. MJ 17-29-GF-JTJ |
| **Clayton MARTELL residence, described as a Blue single story house with white trim.  The residence is located at 314 E Street East, Poplar, Montana, 59255** | **AFFIDAVIT IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT** |

I, John J. Grinsell, being first duly sworn, depose and state as follows:

## INTRODUCTION

1.      I am a Special Agent with the Bureau of Indian Affairs - Office of Justice Services (BIA-OJS).  As such, I am "an investigative or law enforcement officer of the United States," within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations and to make arrests for offenses enumerated in 18 U.S.C. § 2516 and Title 21 of the United States Code.  I became a Special Agent with the Bureau of Indian Affairs in December 2011.  I am currently assigned to the Blackfeet Indian Reservation.  Prior to my current assignment, I worked for two years and half years as a Chief of Police on the Blackfeet Indian Reservation. I also served as a Police Officer for the Bureau of Indian Affairs for a period 10

years. I have also served as a Task Force Officer with the Blackfeet Safe Trails
Task Force. I have received training from several state, local, and federal law
enforcement agencies around the United States during my tenure as a sworn law
enforcement officer. I have attended and completed the United States Indian
Police Academy and the Federal Law Enforcement Training Center, in Artesia
New Mexico. I have also completed the Basic Criminal Investigator Training
Program at the Federal Law Enforcement Training Center, in Glyn County
Georgia. In addition, I have received numerous trainings in the area of drug
investigations and drug identification.

2.     As a result of my experience and training, I have conducted and/or
participated in many complex investigations, to include, but not limited to,
physical and electronic surveillances, questioning of witnesses, suspects, and
informants, applications and executions of search, seizure, and arrest warrants,
evidence collection, money laundering and other financial crimes, and recognition
of controlled substances. I also have training and experience in the recognition of
paraphernalia used for ingesting, distributing, manufacturing, and storing
controlled substances, as well as recognizing conduct common to drug traffickers.
Some of the methods common to drug traffickers include the laundering of drug

2

proceeds derived from the sale of illicit substances, as well as the secreting of assets.

3.      The statements contained in this Affidavit are based on my experience and background as a Police Officer with the BIA Northern Cheyenne Police Department; Special Agent with the Bureau of Indian Affairs – Office of Justice Services - Division of Drug Enforcement; and on information provided by other law enforcement officers and agents.

4.      Based on your Affiant's training, experience, and participation in previous investigations, your Affiant knows:

a.      That individuals involved in the acquisition, manufacture, transportation, and distribution of illegal controlled substances, such as methamphetamine, heroin and marijuana, often maintain books, records, recordings, notes, receipts, ledgers, bank records, money orders and other accounts of their activities in order to document to whom they owe money, who owes them money, and expenses incurred in their endeavors. These records are sometimes kept in the form of electronic media on a variety of electronic devices including, but not limited to, cellular telephones, electronic notebooks, personal digital assistants, or other electronic devices capable of inputting,

3

storing, retrieving, and/or transmitting electronic forms of information. These records are sometimes kept on computer software as well as on the hard drives of the computers themselves. It is common for individuals involved in the transportation of controlled substance to be "fronted" expense money. Receipts and records are often kept by those persons to whom monies are "fronted" so that they may account for the expenditures of the funds to those who provide the monies. Based on my training and experience, I know that it is common for such individuals to maintain these types of records in their residence, or in locations readily accessible by them, such as in vehicles under their control.

b. Individuals involved in the acquisition, manufacture, transportation, and distribution of illegal controlled substances, such as methamphetamine, heroin, and marijuana, maintain addresses and/or telephone numbers in books or papers which reflect names, addresses and/or telephone numbers for their customers and associates in their illegal organization. These records are sometimes kept in the form of electronic media on a variety of electronic devices including, but not limited to, cellular telephones, electronic notebooks, personal digital assistants, or other electronic devices capable of inputting, storing,

4

retrieving, and/or transmitting electronic forms of information. These records are sometimes kept on computer software as well as on the hard drives of the computers themselves.

c. Individuals involved in the acquisition, manufacture, transportation, and distribution of illegal controlled substances, such as methamphetamine and heroin, sometimes take or cause to be taken photographs and/or video recordings of them, their associates, their property and their product. These individuals usually maintain these photographs and recordings in their possession or on their premises.

d. Individuals involved in the acquisition, manufacture, transportation, and distribution of illegal controlled substances, such as methamphetamine, often use/abuse controlled substances and maintain paraphernalia to weigh, store, dilute, package, and use illegal controlled substances. This paraphernalia includes but is not limited to scales, sifters, plastic bags, heat sealers, cutting agents, mirrors, vials, razor blades, inhaling devices, syringes, chemicals and precursors to manufacture a controlled substance, cooking instrument, tubing, piping, glass containers, strainers, or separators and heating elements, and a wide array of various electric devices, book and magazines dealing with the trafficking in controlled substances.

5

e.  Individuals involved in the acquisition, manufacture, transportation, and distribution of illegal controlled substances, such as methamphetamine and heroin, often maintain amounts of money, financial instruments, computers, furniture, entertainment equipment, and firearms, which are proceeds from or intended to be used for drug transactions.

f.  Individuals involved in the acquisition, manufacture, transportation, and distribution of illegal controlled substances, such as methamphetamine and heroin, attempt to legitimize those profits. I know that to attempt to legitimize these profits, these individuals often utilize false and fictitious business records, cashier's checks, money drafts, and business fronts.

g.  Individuals involved in the acquisition, manufacture, transportation, and distribution of illegal controlled substances, such as methamphetamine and heroin, will often establish and/or utilize a business to provide them with a seemingly legitimate income and as a conduit for the payment of expenses related to their illegal enterprise, the purchase of needed equipment, chemicals, precursors and the disbursement of proceeds for their illegal endeavors. It is common that such businesses maintain records of these transactions.

6

h.  It is recognized that unexplained wealth is evidence of crimes motivated by greed, in particular, trafficking in illegal controlled substances.  The distribution or trafficking in illegal controlled substances is a cash business by nature.  Individuals involved in drug trafficking receive large sums of cash from the sales of drugs, which are used to re-invest in more drugs, operate their drug business, obtain personal assets, etc.

i.  Individuals who deal in illegal controlled substances commonly secret contraband, proceeds of drug sales and records of drug transactions in secure locations within their residence and at other premises, in vehicles under their control, and/or on their person for ready access and to conceal them from law enforcement authorities.

j.  That persons involved in crimes involving controlled substances often will secure the fruits of their crime(s), or other evidence of criminal activity, in secure, lockable containers under their control including but not limited to safes, lockboxes, tool boxes, fireproof boxes, cabinets, cupboards, drawers, backpacks, suitcase, briefcases, money bags, bank bags, duffel bags, or purses in order to keep said items secure and concealed from others, including law enforcement.

7

k.  That in order to detect, locate, uncover, seize, secure, or otherwise gain custody over items of personal property which may be evidence of criminal activity during the course of the search authorized by a search warrant, and authorized to be seized by the search warrant it may be necessary for law enforcement to use any reasonable means necessary to gain access to these secure, lockable containers that would otherwise unduly frustrate the efforts of the search warrant and the interests of justice.

l.  It is recognized that the manufacture, cultivation, distribution, transportation, trafficking and possession of controlled substances, such as methamphetamine, heroin, and marijuana, is a dangerous enterprise as it often involves the interacting with persons accustomed to criminal activity, while at the same time being in possession of large sums of money, or in possession of a highly sought-after product. It is also recognized that crimes of violence are often the result of drug deals that have gone bad. As such, individuals involved with the manufacture, cultivation, distribution, transportation, trafficking and possession of controlled substances, such as methamphetamine, often keep weapons, to include firearms, knives, explosives, and/or any other item which may be used to protect and/or

8

guard controlled substances, proceeds of drug transactions, and/or the personal security of the drug traffickers themselves.

5.     Based on the information below, I believe there is probable cause that the aforementioned residence contains evidence of the commission of drug trafficking offenses in violation of 21 U.S.C. § 841(a)(1), and 21 U.S.C. § 846, including contraband, fruits of one or both crimes, and property used or intended to be used in the commission of one or both crimes.

## RESIDENCE TO BE SEARCHED

6.     This affidavit is submitted under Rule 41 of the Federal Rules of Criminal Procedure and made in support of an application for a search of a residence, referred to as the "SUBJECT RESIDENCE," described as follows:

**Clayton MARTELL residence, described as a Blue single story house with white trim.  The residence is located at 314 E Street East, Poplar, Montana, 59255.  A photograph of this residence is attached as Exhibit A.**

## BACKGROUND

7.     Law enforcement officers have conducted five controlled buys of suspected methamphetamine from Clayton MARTELL.  The four purchases of methamphetamine were made from MARTELL at the SUBJECT RESIDENCE, which is located at 314 E Street East, Poplar, Montana.  One purchase was made from MARTELL out of his vehicle, license plate number 17-0394B, which is a

9

1994 White Ford, Pickup registered to Vincent Clayton MORAN Jr. (Deceased) who was an uncle to MARTELL.

8.      In regard to the controlled buys described below, the confidential source was thoroughly searched by law enforcement prior to the controlled narcotics purchase from MARTELL.  This process ensured that any drugs possessed by the confidential source at the conclusion of the controlled buy were solely purchased from the target of the investigation.  During the controlled buys conducted in this investigation, a wireless transmitting and recording device was affixed to the confidential source in order to capture and record the controlled buy.

9.      The suspected methamphetamine purchased from MARTELL at the SUBJECT RESIDENCE will be submitted to the DEA Laboratory for final analysis.  Law enforcement, however, has already field tested the suspected methamphetamine previously purchased from MARTELL with a NARTEC test Ampules, and the NARTEC field test indicated a positive reaction for the presence of methamphetamine.

10.     In March 2017, BIA Supervisory Special Agent Kevin Proctor contacted your affiant and advised that he had a potential confidential source (hereafter referred to as CS# 310-13-077) on the Ft. Peck Indian Reservation.  CS #310-13-077 expressed interest in assisting law enforcement by providing drug

information and conducting controlled drug transactions for monetary gain. CS #310-13-077 wanted to provide assistance to law enforcement to help combat the problem of drugs, particularly methamphetamine, in the communities of the Ft. Peck Reservation, including Poplar, Wolf Point and Brockton, Montana. CS #310-13-077 told law enforcement agents that he/she had direct knowledge of Clayton MARTELL trafficking methamphetamine on the Ft. Peck Indian Reservation. CS #310-13-077 stated, against his/her own penal interest, that he/she had purchased methamphetamine from MARTELL prior to assisting law enforcement. As such, CS #310-13-077 had direct knowledge that MARTELL has been and is currently selling drugs on the Ft. Peck Indian Reservation.

11.     CS #310-13-077 has been paid approximately $1,000 since March 2017 to assist law enforcement. CS #310-13-077 has provided information and made controlled purchases from unrelated targets at the direction of law enforcement. The assistance provided by CS #310-13-077, and described in this affidavit, has been corroborated by law enforcement through surveillance and recorded statements. Additionally, CS #310-13-077 has provided information that has proven to by correct.

12.     In March 2017, CS# 310-13-077 was contacted by RAC (Regional Agent in Charge) Kevin Proctor and your affiant. CS# 310-13-077 met with RAC

11

Proctor and your affiant in Poplar, Montana. Your affiant interviewed CS #310-13-077 and was advised by CS# 310-13-077 that a male by the name of Clayton MARTELL was selling large amounts of methamphetamine in the Poplar area. CS# 310-13-077 stated that he/she has been friends with MARTELL and that he/she and MARTELL talk on a regular basis. CS# 310-13-077 stated that MARTELL was selling methamphetamine to Ft. Peck tribal members out of the SUBJECT RESDIENCE located on the Ft. Peck Indian Reservation.

### 13.   **First Controlled Buy**

On March 2, 2017, your Affiant and BIA Supervisory Special Agent Kevin Proctor met with CS# 310-13-077. CS# 310-13-077 advised that he/she had knowledge that Clayton MARTELL was continuing to sell methamphetamine at the SUBJECT RESIDENCE.

The agents met with CS# 310-13-077 at a predetermined location in Poplar, Montana. CS# 310-13-077 got into the agents' vehicle. CS# 310-13-077 was searched by agents and no money or contraband was found. Your affiant provided CS# 310-13-077 with $400 in pre-recorded BIA buy funds. CS# 310-13-077 was also given an electronic transmitting device (body wire). The agents tested the device and found that it was working. The agents dropped off CS# 310-13-077 a block away from the SUBJECT RESIDENCE. The agents maintained audio/visual surveillance until CS# 310-13-077 arrived at the MARTELL residence. The

12

agents maintained audio surveillance from that point on. MARTELL met CS#
310-13-077 at the door and allowed CS# 310-13-077 to enter the SUBJECT
RESDIENCE. MARTELL asked CS# 310-13-077 what he/she wanted. CS# 310-
13-077 replied that he/she wanted $400.00 worth. CS# 310-13-077 then provided
MARTELL with $400.00 in pre-recorded buy funds, and MARTELL handed CS#
310-13-077 one small plastic baggie containing purported methamphetamine. CS#
310-13-077 left the SUBJECT RESIDENCE, walked to the agents' vehicle, got
into the vehicle with the agents, and left the area. Immediately following the
controlled purchase, agents interviewed CS# 310-13-077. CS# 310-13-077 stated
that he/she walked to the SUBJECT RESIDENCE and met with MARTELL. CS#
310-13-077 gave MARTELL $400.00 in pre-recorded buy funds. MARTELL
gave CS# 310-13-077 one plastic baggy containing purported methamphetamine.
CS# 310-13-077 left the SUBJECT RESIDENCE. CS# 310-13-077 returned to the
agents. Your affiant took control of the suspected methamphetamine purchased
from MARTELL. Before placing the suspected methamphetamine into evidence,
your affiant weighed it on a digital weight scale. The total weight of the small
plastic baggie was approximately 3.4 grams.

14.    **Second Controlled Buy**

On March 3, 2017, your Affiant and BIA Supervisory Special Agent Kevin

13

Proctor, BIA Special Agent Martin Armajo Jr., Ft. Peck Tribes Narcotics

Investigator Clay McGeshick, and Ft. Tribes Officer Jay Brugh Jr. met with CS#

310-13-077.  CS# 310-13-077 advised that he/she had knowledge that Clayton

MARTELL was continuing to sell methamphetamine at the SUBJECT

RESIDENCE.

The agents met with CS# 310-13-077 at the predetermined location in

Poplar, Montana.  CS# 310-13-077 got into the agents' vehicle.  CS# 310-13-077

was searched by agents and no money or contraband was found.  Your affiant

provided CS# 310-13-077 with $400 in pre-recorded BIA buy funds.  CS# 310-13-

077 was also given an electronic transmitting device (body wire).  The agents

tested the device and found that it was working.  The agents dropped CS# 310-13-

077 off a block away from the SUBJECT RESIDENCE.  The agents maintained

audio/visual surveillance until CS# 310-13-077 arrived at the MARTELL

residence.  The agents maintained audio surveillance from that point on.  CS# 310-

13-077 was met by MARTELL at the door and allowed to enter the SUBJECT

RESDIENCE.  MARTELL asked CS# 310-13-077 what he/she wanted.  CS# 310-

13-077 replied that he/she wanted $400.00 worth.  CS# 310-13-077 then provided

MARTELL with $400.00 in pre-recorded buy funds, and MARTELL handed CS#

310-13-077 one small plastic baggie containing purported methamphetamine.  CS#

310-13-077 left the SUBJECT RESIDENCE, walked to the agents' vehicle, got

14

into that vehicle with the agents, and left the area. Immediately following the controlled purchase agents interviewed CS# 310-13-077. CS# 310-13-077 stated that he/she walked to the SUBJECT RESIDENCE and met with MARTELL. CS# 310-13-077 gave MARTELL $400.00 in pre-recorded buy funds. MARTELL gave CS# 310-13-077 one plastic baggie containing purported methamphetamine. CS# 310-13-077 left the SUBJECT RESIDENCE. CS# 310-13-077 returned to the agents. Your affiant took control of the suspected methamphetamine purchased from MARTELL. Before placing the suspected methamphetamine into evidence, your affiant weighed it on a digital weight scale. The total weight of the small plastic baggie was approximately 3.6 grams.

15.   **Third Controlled Buy**

On March 10, 2017, your Affiant, Regional Agent in Charge Kevin Proctor, Ft. Peck Criminal Investigator Ken Trottier, and Ft. Peck Tribal Officer Jay Brugh Jr. met with CS# 310-13-077. CS# 310-13-077 advised that he/she had knowledge that Clayton MARTELL was continuing to sell methamphetamine at the SUBJECT RESIDENCE

The agents met with CS# 310-13-077 at the predetermined location, located in Poplar, Montana. CS# 310-13-077 got into the agents' vehicle. CS# 310-13-077 was searched by agents and no money or contraband was found. CS# 310-13-

15

077's vehicle was searched by agents no money or contraband was found. Your affiant provided CS# 310-13-077 with $700 in pre-recorded BIA buy funds. CS# 310-13-077 was also given an electronic transmitting device (body wire). The agents tested the device and found that it was working. CS# 310-13-077 drove him/her vehicle to the SUBJECT RESIDENCE. The agents maintained audio/visual surveillance until CS# 310-13-077 arrived at the SUBJECT RESIDENCE. The agents maintained audio surveillance from that point on. CS# 310-13-077 was met by MARTELL at the door and allowed to enter the SUBJECT RESIDENCE. MARTELL asked CS# 301-13-077 what he/she wanted. CS# 310-13-077 replied that he/she wanted $700.00 worth. CS# 310-13-077 then provided MARTELL with $700.00 in pre-recorded buy funds and MARTELL handed CS# 310-13-077 one small plastic baggie containing purported methamphetamine. CS# 310-13-077 left the SUBJECT RESIDENCE, and CS# 310-13-077 drove his/her vehicle back to the predetermine location. Immediately following the controlled purchase agents interviewed CS# 310-13-077. CS# 310-13-077 stated that he/she drove to the SUBJECT RESIDENCE. CS# 310-13-077 approached the SUBJECT RESIDENCE. CS# 310-13-077 gave MARTELL $700.00 in pre-recorded buy funds and MARTELL handed CS# 310-13-077 one plastic baggie containing purported methamphetamine. CS# 310-13-077 left the SUBJECT RESIDENCE. CS# 310-13-077 returned to agents at a predetermined location. Your affiant took

control of the suspected methamphetamine purchased from MARTELL.   The

evidence was immediately placed into an evidence bag and sealed before it was put

onto a digital weight scale.

16.   **Fourth Controlled Buy**

On March 17, 2017, your Affiant, and Ft. Peck Tribal Narcotics

Investigators Clay McGeshick and Jay Brugh Jr. met with CS# 310-13-077.  CS#

310-13-077 advised that he/she had knowledge that Clayton MARTELL was

continuing to sell methamphetamine at the SUBJECT RESIDENCE.

The agents met with CS# 310-13-077 at the predetermined location, located

in Poplar, Montana.  CS# 310-13-077 got into the agents' vehicle.  CS# 310-13-

077 was searched by agents and no money or contraband was found.  CS# 310-13-

077's vehicle was searched by agents and no money or contraband was found.

Your affiant provided CS# 310-13-077 with $300 in pre-recorded BIA buy funds.

CS# 310-13-077 was also given an electronic transmitting device (body wire).  The

agents tested the device and found that it was working.   The agents maintained

audio/visual surveillance until CS# 310-13-077 arrived at the TARGET

RESIDENCE.  CS# 310-13-077 was met by MARTELL at the door and allowed to

enter the SUBJECT RESDIENCE.  CS# 310-13-077 asked MARTELL what

he/she wanted.  CS# 310-13-077 replied that he/she wanted $300.00 worth.  CS#

310-13-077 then provided MARTELL with $300.00 in pre-recorded buy funds and MARTELL handed CS# 310-13-077 one small plastic baggie containing purported methamphetamine. CS# 310-13-077 left the SUBJECT RESIDENCE. CS# 310-13-077 returned to agents at a predetermined location. Your affiant took control of the suspected methamphetamine purchased from MARTELL. Immediately following the controlled purchase from MARTELL agents interviewed CS# 310-13-077. CS# 310-13-077 stated that he/she drove to the SUBJECT RESIDENCE. CS# 310-13-077 approached the SUBJECT RESIDENCE. CS# 310-13-077 gave MARTELL $300.00 in pre-recorded buy funds. MARTELL handed CS# 310-13-077 one plastic baggie containing purported methamphetamine. CS# 310-13-077 left the SUBJECT RESIDENCE. CS# 310-13-077 returned to the agents at a predetermined location. Your affiant took control of the suspected methamphetamine. Before placing the suspected methamphetamine into evidence, your affiant weighed it on a digital weight scale. The total weight of the small plastic baggie was approximately 3.1 grams.

17.   **Fifth Controlled Buy**

On April 24, 2017, BIA Special Agents Cameron Tobacco and Martin Armajo, as well as RAC (Regional Agent in Charge) Kevin Proctor met with CS# 310-13-077. CS# 310-13-077 advised that he/she had knowledge that Clayton

18

MARTELL was continuing to sell methamphetamine at the SUBJECT
RESIDENCE.

The agents met with CS# 310-13-077 at the predetermined location, located
in Poplar, Montana.  The agents searched CS# 310-13-077's vehicle and no money
or contraband was found.  CS# 310-13-077 was searched by agents and no money
or contraband was found.  Your affiant provided CS# 310-13-077 with $200 in
pre-recorded BIA buy funds.  CS# 310-13-077 was also given an electronic
transmitting device (body wire).  The agents tested the device and found that it was
working.  The agents followed the CS# 310-13-077 to a predetermined located that
was designated by MARTELL.  The agents maintained audio/visual surveillance
until CS# 310-13-077 arrived at the predetermined meeting area.  The agents
maintained audio surveillance from that point on.  MARTELL arrived to meet CS#
310-13-077.  MARTELL asked CS# 310-13-077 what he/she wanted.  CS# 310-
13-077 replied that he/she wanted $200.00 worth.  CS# 310-13-077 then provided
MARTELL with $200.00 in pre-recorded buy funds and MARTELL handed CS#
310-13-077 one small plastic baggie containing purported methamphetamine.  CS#
310-13-077 left the predetermined meeting area and returned to agents at a
predetermined location.  Immediately following the controlled purchase agents
interviewed CS# 310-13-077.  CS# 310-13-077 stated that he/she met MARTELL

at a predetermined location in Poplar, Montana. CS #310-13-007 handed

MARTELL $200 in pre-recorded BIA buy funds and MARTELL handed CS #310-

13-007 one plastic baggie containing purported methamphetamine. After the

purchase, CS #310-13-007 handed SA Tobacco the plastic baggie. SA Tobacco

searched CS #310-13-077's vehicle and no money or contraband was found.

Before placing the suspected methamphetamine into evidence, your affiant

weighed it on a digital weight scale. The total weight of the small plastic baggie

was approximately 1.2 grams.

18. On April 25, 2017, CS#310-13-077 contacted SSA Proctor by phone.

CS#310-13-077 stated MARTELL had contacted him/her and asked if he/she had

any money. MARTELL told CS#310-13-077 he had just "re-upped" (agents knew

this term to mean MARTELL had just purchased methamphetamine from his

source of supply for distribution). Based on this information, your affiant believes

MARTELL possesses a quantity of methamphetamine for distribution at the

SUBJECT RESIDENCE.

## CONCLUSION

19. As a result of your affiant's personal participation in this investigation

and knowledge gained from reports and conversations with other law enforcement

officers, your affiant believes the facts contained in this affidavit show there is

probable cause to believe that MARTELL is involved in drug trafficking offenses

in violation of 21 U.S.C. § 841(a)(1) and 21 U.S.C. § 846, and has distributed

and/or stored methamphetamine for distribution in the SUBJECT RESIDENCE,

and that methamphetamine, documents, records, cash, and evidence of the crimes

set forth in this affidavit are located in the SUBJECT RESDIENCE.

Respectfully submitted,

John Grinsell
Special Agent
Bureau of Indian Affairs-Division of
Drug Enforcement

Subscribed and sworn to before me on this 28 day of April 2017.

HON. JOHN T. JOHNSTON
United States Magistrate Judge

21